UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

P.A.L. ENVIRONMENTAL SAFETY
CORP.

              Plaintiff,

              v.

NORTH AMERICAN DISMANTLING
CORP. ET AL.

              Defendants.

_____/

Case No. 19-11630

SENIOR U. S. DISTRICT JUDGE
ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
DAVID R. GRAND

**ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT CONSUMERS ENERGY COMPANY'S MOTION TO DISMISS [7]; GRANTING COUNTER-DEFENDANT P.A.L. ENVIRONMENTAL SAFETY CORP.'S MOTION TO DISMISS COUNT IV [22]**

Plaintiff P.A.L. Environmental Safety Corp. ("PAL") is a corporation that conducts asbestos abatement work for demolition projects. Defendant Consumers Energy Company owns the JC Weadock Power Plant in Essexville, Michigan, ("Power Plant") which is being abated, dismantled and demolished pursuant to a contract with the project's prime contractor: Defendant North American Dismantling Corporation ("NADC"). NADC subcontracted with PAL to perform the asbestos abatement phase of the project. Defendant North American Specialty

Insurance Company ("NASIC") is the surety on a labor and material payment bond issued to PAL on behalf of NADC. PAL is suing all three defendants to recover $23,841,833.37 in unpaid labor and materials for its asbestos abatement work at the Power Plant. This estimate is over twice the original contract price. PAL claims it includes both extra and changed work that it performed.

PAL filed its Complaint [1] on June 3, 2019, alleging the following claims: (Count I) Breach of Contract against NADC; (Count II) Breach of Payment Bond against NADC and NASIC; (Count III) Unjust Enrichment against CEC; (Count IV) Third Party Beneficiary Breach of Contract against CEC; (Count V) Promissory Estoppel against CEC; and (Count VI) Negligent Misrepresentation against CEC. (ECF No. 1).

Defendant CEC filed a Motion to Dismiss [7] PAL's Complaint pursuant to FED. R. CIV. P. 12(b)(6) on July 3, 2019. On August 7, 2019, PAL filed a Response [18]. CEC filed a Reply [19] on August 14, 2019. Defendant NASIC filed an Answer [8] on July 8, 2019.

Defendant NADC filed a Counter Complaint [12] against PAL on July 15, 2019, alleging the following claims: (Count I) Breach of Contract for failure to timely complete work; (Count II) Breach of C

ontract for failure to pay employees, agents and subcontractors; (Count III) Indemnification; and (Count IV) Breach of Contract for work on the Indianapolis Power & Light Company project ("IPL"). (ECF No. 12).

Counter-Defendant PAL filed a Motion to Dismiss Count IV [22] of NADC's Counter Complaint pursuant to FED. R. CIV. P. 12(b)(2) and (b)(3) on August 16, 2019. On September 20, 2019, NADC filed a Response [25]. PAL filed a Reply [26] on October 4, 2019. The Court held a hearing on the motions on December 18, 2019.

For the reasons stated below, the Court **DENIES in part and GRANTS IN PART** Defendant CEC's Motion to Dismiss [7] PAL's Complaint and **GRANTS** Counter-Defendant PAL's Motion to Dismiss Count IV [22] of NADC's Counter Complaint.

## FACTUAL BACKGROUND

On August 4, 2017, Defendant CEC, as owner, and NADC, as prime contractor, entered into a written contract in which NADC agreed to abate, dismantle and demolished the JC Weadock Power Plant ("Prime Contract").  Compl. at ¶ 18. On or about August 29, 2017, PAL, as subcontractor, and NADC, as prime contractor, entered into a written subcontract in which PAL agreed to perform abatement of all asbestos containing material ("ACM") at the Power Plant

("Subcontract"). Compl. at ¶ 12. PAL alleges that the scope of the subcontract is dictated by its August 15, 2017 proposal. *Id.*

The subcontract price for PAL's abatement work was $7,996,331. Compl. at ¶ 21. However, as a result of performing extra and changed work, PAL alleges that it is entitled to an adjusted contract price of $23,883,739.37. Compl. at ¶ 22. Specifically, PAL alleges that it performed three categories of additional work: (1) fly ash and coal dust removal, (2) refractory brick abatement, and (3) an extra amount of ACM removal.

First, PAL alleges that CEC contractual and orally represented that the fly ash/coal dust would already be removed before PAL began its work and only "some ash residuals would remain." Compl. at ¶ 23-24. Despite this, PAL claims that CEC never removed the fly ash and/or coal dust as promised, leaving PAL to dispose of it and incur increased costs in the process. Compl. at ¶ 25, 28.

Second, PAL claims that it planned to clean the refractory brick and leave it to be removed by NADC on the next phase of the project, however, after the project began, PAL was told to remove refractory brick because it contained asbestos. Compl. at ¶ 30-31.

Third, PAL claims that the Golder Report, an attachment to the Prime Contract, estimated that only 7,441 CY of ACM would need to be abated and removed by PAL. Compl. at ¶ 33. However, PAL alleges that it has removed 14,260 CY of ACM as of May 21, 2019 and expects to remove in excess of 15,770 CY of ACM by the project's completion. Compl. at ¶ 34.

PAL claims, *inter alia*, that NADC breached their Subcontract by failing to submit change orders to CEC for approval so that it could invoice and be paid for the increased costs. Compl. at ¶ 41. PAL further claims that NADC is in breach by directing PAL to increase its work force, extend overtime, and accelerate its work without compensation for increased costs. Compl. at ¶ 44. Since PAL and CEC are not in a contract together, PAL claims breach of contract by CEC as a third-party beneficiary to the Prime Contract and seeks equitable remedies in the alternative.

In its Counter Complaint, NADC claims that PAL's failures delayed NADC's demolition portion of the project, breaching their Subcontract and forcing NADC to incur increased costs and expenses. Compl. at ¶ 30-33. In addition to the breach of contract claims regarding the Power Plant, NADC also brings a counterclaim regarding a separate subcontract between NADC and PAL in the Indianapolis Power and Light Company ("IPL") project. Similar to the Power Plant, in February 2018, NADC, as prime contractor entered into an agreement with PAL, as subcontractor,

to abate and remove all ACM from IPL ("IPL Subcontract"). Countercompl. at ¶ 56.
NADC claims that PAL breached the contract by failing to timely complete its work
causing NADC to incur increased expenses.  Countercompl. at ¶ 57-60.

ANALYSIS

## I.    CEC's Motion to Dismiss [7] PAL's Complaint

Defendant CEC argues that the Court should dismiss PAL's claims against it
for failing to state a claim upon which relief can be granted under FED. R. CIV. P.
12(b)(6). "To survive a motion to dismiss, [plaintiff] must allege 'enough facts to
state a claim to relief that is plausible on its face.'" *Traverse Bay Area Intermediate
Sch. Dist. v. Mich. Dep't of Educ.*, 615 F.3d 622, 627 (6th Cir. 2010) (quoting *Bell
Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court must "assume the
veracity of [the plaintiff's] well-pleaded factual allegations and determine whether
the plaintiff is entitled to legal relief as a matter of law." *McCormick v. Miami Univ.*,
693 F.3d 654, 658 (6th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679
(2009)). The Court must construe the complaint in the light most favorable to the
plaintiff and draw all reasonable inferences in the plaintiff's favor. *Ohio Police &
Fire Pension Fund v. Standard & Poor's Fin. Servs. LLC*, 700 F.3d 829, 835 (6th
Cir. 2012).

### a.  Unjust Enrichment and Promissory Estoppel

To sustain an unjust enrichment claim, a plaintiff must demonstrate (1) the defendant's receipt of a benefit from the plaintiff and (2) an inequity to the plaintiff as a result. *Dumas v. Auto Club Ins. Ass'n,* 437 Mich. 521, 546 (1991); *Karaus v. Bank of New York Mellon,* 300 Mich. App. 9, 23 (2013). Promissory estoppel, on the other hand, requires (1) a promise, (2) that the defendant should have reasonably expected would induce action or forbearance by the plaintiff, and (3) that did in fact induce such action or forbearance in circumstances such that the promise must be enforced if injustice is to be avoided. *KSR Int'l Co. v. Delphi Auto. Sys., LLC*, 523 F. App'x 357, 363 (6th Cir. 2013) (citing *Metropolitan Alloys Corp. v. Considar Metal Mktg., Inc.,* 615 F.Supp.2d 589, 598 (E.D. Mich. 2009).

Both unjust enrichment and promissory estoppel are equitable remedies that a court may impose in lieu of an express contract between the parties in order to prevent injustice. *Meisner Law Group PC v. Weston Downs Condominium Association*, 321 Mich. App. 702 (2017). In short, the court implies a contract where none exists. *Id*; *Detroit v. Highland Park*, 326 Mich. 78, 100, 39 N.W.2d 325 (1949) ("[a]n implied-in-law contract is a legal fiction 'to enable justice be accomplished' even if there was no meeting of the minds and no contract was intended.").

Accordingly, CEC argues that PAL cannot launch these equitable remedies against CEC because a contract exists. Specifically, the Prime Contract between CEC as owner and NADC as prime contractor and the Subcontract between NADC as prime contractor and PAL as subcontractor. (ECF No. 7, PageID. 58). CEC argues that "[t]here cannot be an express and implied contract covering the same subject matter at the same time." *Campbell v. City of Troy*, 42 Mich. App. 534, 537 (1972).

PAL counters that under Michigan Court of Appeals case, *Morris Pumps*, in order for an express contract to bar equitable claims, it cannot just cover the same subject matter — it also needs to be "*between the same parties.*" *Morris Pumps v. Centerline Piping, Inc.*, 273 Mich. App. 187, 194–95 (2006) (emphasis in original) ("'[g]enerally, an implied contract may not be found if there is an express contract *between the same parties* on the same subject.' 42 CJS, Implied and Constructive Contracts, § 34, p. 33").

In *Morris Pumps*, The City of Detroit contracted with a general contractor to construct a wastewater treatment facility. *Morris Pumps*, 273 Mich. App. at 190. The general contractor then subcontracted with a piping company to complete the mechanical portion of the project. *Id.* The subcontractor then contracted with a supplier for materials. *Id.* Although the supplier delivered the materials on time, it was never paid by the subcontractor, who soon went out of business and left the

project. *Id.* Despite this, the general contractor hired a replacement subcontractor who used the supplier's material to finish the project. *Id.* at 191. The supplier then sued the general contractor for unjust enrichment.

The defendant general contractor made an argument identical to CEC's: "[the supplier's] unjust enrichment claims against it were barred by the existence of express contracts executed between [the supplier] and [the subcontractor], which covered the same subject matter." *Id.* at 194. The court, however, disagreed. It held that the mere existence of express contracts between the supplier and the subcontractor did not bar recovery from the general contractor in quantum meruit. *Id.* at 194-95. This is because the general contractor was not a party to any of those contracts and therefore did not have a contractual relationship with the supplier. *Id.* at 194-95; *see also Zervos v. Johnson* et al, No. 12-13121, 2013 WL 4833974 (E.D. Mich. Sept. 11, 2013) (finding that under *Morris Pumps* "any privity of contract that may exist between Plaintiff and other entities does not necessarily void Plaintiff's claim as to these Defendants.").

Although this case involves a subcontractor suing an owner rather than a supplier suing a general contractor, the same logic applies. There are two express contracts in this case, but none between PAL and CEC. Therefore, they have no contractual relationship and PAL has no other avenue to recover from CEC outside

of an equitable remedy. Finding that Plaintiff has alleged sufficient facts that could entitle it to equitable remedies, PAL's unjust enrichment and promissory estoppel claims against CEC are not dismissed.

### b. Third Party Beneficiary

PAL alleges that it is a third-party beneficiary to the Prime Contract between CEC and NADC and can therefore launch a breach of contract claim against CEC. CEC argues that PAL is not an intended third-party beneficiary of the Prime Contract and is barred from suing for breach. The Court agrees.

Courts must objectively analyze a contract in order to determine if a third-party beneficiary was intended through a direct promise. *Kisiel v. Holz*, 272 Mich. App. 168, 171–72 (2006) (citing *Schmalfeldt v. N. Pointe Ins. Co.,* 469 Mich. 422, 427 (2003). "A third person cannot maintain an action on a simple contract merely because he or she would receive a benefit from its performance or would be injured by its breach . . . '[t]hird-party beneficiary status requires an express promise to act to the benefit of the third party; where no such promise exists, that third party cannot maintain an action for breach of the contract." *Kisiel v. Holz*, 272 Mich. App. 168, 171–72 (2006) (quoting *Dynamic Constr. Co. v. Barton Malow Co.,* 214 Mich. App. 425 (1995)).

Here, not only does the Prime Contract not include a direct promise to PAL as a third-party beneficiary, it also explicitly states that the contract does not create any third-party beneficiary status.

> 2.8   <u>Third Party Beneficiaries.</u> Unless and except as may be specifically stated herein, nothing contained in this Contract shall create any contractual relationship, including but not limited to any third party beneficiary status, between or establish any rights or benefits in favor of, anyone other than the Owner and the Contractor.

(ECF No. 18-6, PageID. 545). Therefore, to the extent that PAL has received any benefit from the Prime Contract's existence, it is at best an incidental beneficiary, which "has no rights under a contract." *Kisiel*, 272 Mich. App. at 170. Accordingly, PAL's breach of contract claim against CEC is dismissed.

### c.  Negligent Misrepresentation

To establish negligent misrepresentation, PAL must prove: "(1) justifiable and detrimental reliance on (2) information provided without reasonable care (3) by one who owed a duty of care." *Chesterfield Exch., LLC v. Sportsman's Warehouse, Inc.*, 572 F. Supp. 2d 856, 866 (E.D. Mich. 2008). PAL claims that CEC negligently misrepresented PAL regarding two pieces of information: (1) the amount of ACM PAL would have to abate and (2) fly ash/coal dust removal prior to PAL's work on the project. Compl. at ¶ 99. PAL supports its claims by citing the contracts, the contracts' attachments and oral representations CEC made to PAL before PAL's bid.

CEC moves to dismiss PAL's claim on two main grounds: (1) PAL's allegations are conclusory and (2) they are barred by the parol evidence rule.

Under *Twombly* and *Iqbal*, the pleading stage requires non-conclusory factual allegations which are "enough to raise a right to relief above the speculative level" and create "more than a sheer possibility that a defendant has acted unlawfully." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court finds that PAL's allegations meet this standard. PAL's Complaint specifically states that both in the Technical Specifications of the Prime Contract and at the pre-bid walk through, CEC represented that it "would remove all fly ash and/or coal dust from the power plant" leaving only "some ash residuals;" however, it was "never removed . . . as promised." Compl. at ¶ 23-25. PAL further alleges that the Prime Contract's Golder Report estimates that PAL would have to abate "7,441 CY of ACM," but by May 21, 2019, PAL had already abated "15,770 CY of ACM" and counting. Compl. at ¶ 33-34. These facts sufficiently allege a plausible claim of negligent misrepresentation.

CEC argues that PAL's claim is barred by the parol evidence rule and the Prime Contract's integration clause (Sec. 1.1 & 1.2) which states that the contract is the "complete integrated agreement between the Owner [CEC] and the Contractor [NADC] . . . [and] supersedes all prior negotiations, understandings and

agreements." (ECF No. 18-6, PageId. 542). However, because no contract, let alone one containing an integration clause, exists between PAL and CEC, the parol evidence rule does not apply here.

"Where parties have deliberately put their agreement into writing . . . it is conclusively presumed that their whole engagement, and the extent and manner of the undertaking, were reduced to writing; and no evidence is permitted tending to vary or contradict its terms, or to substitute a new or different contract for it." *Komraus Plumbing & Heating, Inc. v. Cadillac Sands Motel, Inc.*, 387 Mich. 285, 291 (1972). "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich. App. 574, 580 (1990). Similarly, "[a] written integration clause is conclusive evidence that the parties intended the document to be the final and complete expression of their agreement" such that extrinsic evidence could not be used to vary its terms. *ADR N. Am., L.L.C. v. Agway, Inc.*, 303 F.3d 653, 658 (6th Cir. 2002); *Sattler v. Fisher Contracting Co.*, 30 Mich. App. 617, 621 (1971).

PAL argues that since it is not a party to the Prime Contract, the integration clause and parol evidence rule does not apply to it. This is consistent with the purpose and meaning of integration clauses and the parol evidence rule. An

agreement between the parties is a necessary condition of the parol evidence rule. *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 612 (6th Cir. 2001); 70 A.L.R. 752 (2011) ("[w]hether the parol evidence rule applies depends upon whether there was an integration or a complete expression of the agreement of the parties."). Without an agreement, its terms cannot be changed.

Neither PAL nor CEC allege that they have a contract. PAL only claims that it relied on CEC's representations, both in and outside of a contract with a different party, to its detriment. In fact, the Prime Contract states that it "supersedes all prior negotiations . . . between the Parties hereto," not including any third party or subcontractor. (ECF No. 18-6, PageID. 542). Furthermore, the Subcontract states that the "Subcontract documents shall not be construed to create a contractual relationship of any kind (1) between the Owner [CEC] and Subcontractor [PAL]." (ECF No. 18-7, PageID. 626-37). Considering this evidence, the Court finds that the parol evidence rule does not bar CEC's alleged misrepresentations to PAL.

CEC also claims that the Prime Contract documents, which outlined the amount of ACM PAL would need to remove, only established estimates and that PAL was responsible for ensuring it had the necessary information to accurately bid on the project. Because this argument speaks to the merits of the claim — whether or not PAL justifiably relied on CEC's representations — the Court declines to opine

on the matter at this early stage in the litigation. PAL's non-conclusory factual allegations support the elements of a negligent misrepresentation claim, therefore, the claim survives CEC's Motion to Dismiss.

## II.     PAL's Motion to Dismiss Count IV of NADC's Counter Complaint

Counter-Defendant PAL moves to dismiss NADC's IPL counterclaim against it. This claim alleges that PAL breached it's IPL Subcontract with NADC on a project in Indiana. PAL argues that the Court lacks personal jurisdiction over it in regards to this counterclaim. PAL also argues improper venue or for the Court to impose contractual mediation in the alternative.

### a.  Personal Jurisdiction

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court must consider affidavits and pleadings in the light most favorable to the plaintiff. *Serras v. First Tenessee Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). Plaintiff bears the burden of "making a prima facie showing that personal jurisdiction exists." *Id.* The district court should not weigh "the controverting assertions of the party seeking dismissal." *Air Products and Controls, Inc. v. Safetech Intern., Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir, 1991).

"A federal court may only exercise personal jurisdiction in a diversity case if such jurisdiction is (1) authorized by the law of the state in which the court sits; and (2) is otherwise consistent with the Due Process Clause of the Fourteenth Amendment." *Youn v. Track, Inc.*, 324 F.3d 409, 417 (6th Cir. 2003). The first prong asks whether Michigan courts would have jurisdiction over PAL. Michigan's applicable long arm statute allows courts to exercise general personal jurisdiction over corporations that are (1) incorporated in Michigan, (2) consent to jurisdiction "to the extent authorized by the consent," or (3) carry on continuous and systematic business in Michigan. M.C.L. § 600.711. Michigan also allows its courts to exercise limited personal jurisdiction over corporations for claims arising out of business transactions in the state or contracts for services performed in the state. M.C.L. § 600.715.

The second prong asks whether exercising personal jurisdiction for the defendant is constitutional. "The Due Process Clause of the Fourteenth Amendment constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). In order to be subject to the Court's authority, the nonresident generally must have "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *International Shoe Co. v. Washington*,

326 U.S. 310, 316 (1945)). The Sixth Circuit has provided a three-part test for determining whether a district court can constitutionally exercise specific personal jurisdiction.

> (1) 'the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state;' (2) 'the cause of action must arise from the defendant's activities there;' and (3) 'the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.'

*Youn*, 324 F.3d at 418 (quoting *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir.1968)).

Additionally, the U.S. Supreme Court has noted that personal jurisdiction established by "'express or implied consent' . . . does not offend due process." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n. 14 (1985) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 703 (1982)). This consent may be in the form of a forum-selection provision in a just and freely negotiated contract. *Burger King Corp.,* 471 U.S. at 473 n. 14 (citing *The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 15 (1972)).

NADC has not met their burden under both the state and constitutional standards for establishing personal jurisdiction. Michigan's long arm statute does not extend to PAL. PAL was not incorporated in Michigan and does not have its

principal place of business here. (ECF No. 22-2, PageID. 731). Further, its involvement in only three projects in Michigan in a two-year period does not rise to the level of continuous and systematic business in the state. (ECF No. 26-1, PageID. 852); *Glenn v. TPI Petroleum, Inc.*, 305 Mich. App. 698, 708 (2014) (quoting *Random House Webster's College Dictionary* (2001).) (explaining that "continuous and systematic" business means "'uninterrupted in time'" and involving a "'system, method, or plan.'"). Defendant has not met the "fairly high standard" of showing that PAL has the physical presence or substantial contacts, such as officers or bank accounts, that would render it "essentially at home" in Michigan. *Id.* at 707; *Jones v. Blige*, No. 04-60184, 2006 WL 1329247, at *2 (E.D. Mich. May 16, 2006); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Contrary to NADC's argument, PAL also did not consent to personal jurisdiction in Michigan by agreeing to a forum selection provision in their IPL Subcontract. Section 6.2 of the IPL Subcontract states that "[i]f legal proceedings are instituted by either Party, *venue* shall be the State and Federal Courts in Lapeer, Michigan," not *forum*. (ECF No. 12-5, PageID. 455) (emphasis added). Venue does not confer jurisdiction, it assumes it. Jurisdiction establishes a court's authority over a case and its parties; venue merely refers to a geographic location of a judicial district with said jurisdiction. *Washington v. Roosen, Varchetti & Oliver, PPLC*, 894

F. Supp. 2d 1015, 1030 (W.D. Mich. 2012). Although personal jurisdiction can be waived or consented to via contract, this can only be done through a forum selection provision. *See Burger King Corp.*, 471 U.S. at 473 n. 14. While Section 6.2 of the IPL Subcontract may be unartfully drawn, the Court may only enforce its ordinary and natural meaning, not what a party wishes it means. *See Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 466 (6th Cir. 2009). Therefore, consent to a location does not extend to consent to personal jurisdiction.

Finally, limited personal jurisdiction under Michigan law and the U.S. Constitution both fail because NADC's claim arose from a project in Indiana, not Michigan. NADC has also not alleged that PAL's acts, or consequences of its acts, are substantially connected enough to Michigan to render exercising limited personal jurisdiction reasonable. *Youn*, 324 F.3d at 418.

### b.  Venue

On a Rule 12(b)(3) motion to dismiss for improper venue, the court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."  28 U.S.C. §1406(a).  Venue is proper in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which

a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action." *Id.* § 1391(b). A corporate defendant is "deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." *Id.* § 1391(c)(2); *see also Id.* § 1391(d).

PAL argues that venue in the Eastern District of Michigan is improper, because the events giving rise to NADC's claim occurred in Indiana. The Court agrees. Additionally, venue cannot be proper without personal jurisdiction over PAL. *Id.*

### c. Mediation

Finally, PAL argues that NADC's counter claims against it must dismissed due to the mandatory mediation provision in the IPL Subcontract. This provision states that all claims arising out of the agreement must be subject to mediation "as a condition precedent to institution of legal proceedings . . . unless the Parties mutually agree otherwise." (ECF No. 12-5, PageID. 455). NADC makes an unpersuasive argument, without supporting case law, that this provision does not apply to

counterclaims. (ECF No. 25, PageID. 772-73). Such a contention is contrary to the provision's plain language that "*any claim* arising out of or related to this Agreement . . . shall be subject to mediation." (ECF No. 12-5, PageID. 455) (emphasis added).

Therefore, the Court dismisses NADC's Counterclaim IV with prejudice, because it lacks personal jurisdiction over PAL. Furthermore, the Court encourages the parties to fulfill the condition precedent to legal proceedings in any court and pursue mediation.

### CONCLUSION

For the reasons stated above, the Court **DENIES in part and GRANTS in part** Defendant CEC's Motion to Dismiss [7] PAL's Complaint and **GRANTS** Counter-Defendant PAL's Motion to Dismiss Count IV [22] of NADC's Counter Complaint.

This ruling has the effect of dismissing Count IV of PAL's Complaint (Third Party Beneficiary Breach of Contract against CEC) and Count IV of CEC's Counter Complaint (Breach of Contract for work on the Indianapolis Power & Light Company project).

Accordingly,

**IT IS ORDERED** that Defendant CEC's Motion to Dismiss [7] is **DENIED IN PART and GRANTED IN PART**.

**IT IS FURTHER ORDERED** that Counter-Defendant PAL's Motion to Dismiss [22] is **GRANTED**.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Senior United States District Judge

Dated: May 28, 2020